1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

# UNITED STATES DISTRICT COURT
# DISTRICT OF NEVADA

LUCIA ELENA ANDRADE
GONZALEZ,

       Plaintiff,

v.

LAS VEGAS METROPOLITAN
POLICE DEPARTMENT, *et al*.,

       Defendants.

Case No. 2:12-cv-01247-LDG (PAL)

**ORDER**

      The plaintiff, Lucia Elena Andrade Gonzalez, brought this action alleging that Las Vegas Metropolitan Police officers used excessive force against her while arresting her on September 17, 2011.  The individual defendants, Officers Jonathan Larsen, John Nelson, and Zackery Beal, have moved for summary judgment (#25), as has the Las Vegas Metropolitan Police Department (#26).

      Subsequent to defendants' filing of their respective motions, counsel for Gonzalez obtained a stipulation from defendants to allow her an extra month to file an opposition to the motions.  Counsel then moved to withdraw as counsel, indicating that the professional relationship between Gonzalez and counsel had broken down, and further representation was no longer possible.  The Magistrate Judge granted the motion, and ordered Gonzalez

1  to either retain new counsel and have counsel file an appearance, or file a notice that she

2  would be proceeding *pro se*.  At about the same, counsel for Gonzalez obtained another

3  stipulation from defendants to allow her an additional month to file an opposition to the

4  outstanding motions for summary judgment.

5      Gonzalez neither retained new counsel, nor has she filed a notice of her intent to

6  proceed pro se, nor has she filed any opposition to the motions for summary judgment.

7

8  <u>Motion for Summary Judgment</u>

9      In considering a motion for summary judgment, the court performs "the threshold

10  inquiry of determining whether there is the need for a trial—whether, in other words, there

11  are any genuine factual issues that properly can be resolved only by a finder of fact

12  because they may reasonably be resolved in favor of either party."  *Anderson v. Liberty*

13  *Lobby, Inc.*, 477 U.S. 242, 250 (1986); *United States v. Arango*, 670 F.3d 988, 992 (9th Cir.

14  2012).  To succeed on a motion for summary judgment, the moving party must show (1)

15  the lack of a genuine issue of any material fact, and (2) that the court may grant judgment

16  as a matter of law.  Fed. R. Civ. Pro. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322

17  (1986); *Arango*, 670 F.3d at 992.

18      A material fact is one required to prove a basic element of a claim.  *Anderson,* 477

19  U.S. at 248.  The failure to show a fact essential to one element, however, "necessarily

20  renders all other facts immaterial."  *Celotex*, 477 U.S. at 323.  Additionally, "[t]he mere

21  existence of a scintilla of evidence in support of the plaintiff's position will be insufficient."

22  *United States v. $133,420.00 in U.S. Currency*, 672 F.3d 629, 638 (9th Cir. 2012) (quoting

23  *Anderson*, 477 U.S. at 252).

24      "[T]he plain language of Rule 56(c) mandates the entry of summary judgment, after

25  adequate time for discovery and upon motion, against a party who fails to make a showing

26  sufficient to establish the existence of an element essential to that party's case, and on

2

1    which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322.  "Of

2    course, a party seeking summary judgment always bears the initial responsibility of

3    informing the district court of the basis for its motion, and identifying those portions of 'the

4    pleadings, depositions, answers to interrogatories, and admissions on file, together with the

5    affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material

6    fact." *Id.*, at 323.  As such, when the non-moving party bears the initial burden of proving,

7    at trial, the claim or defense that the motion for summary judgment places in issue, the

8    moving party can meet its initial burden on summary judgment "by 'showing'–that is,

9    pointing out to the district court–that there is an absence of evidence to support the

10   nonmoving party's case." *Id.,* at 325.  Conversely, when the burden of proof at trial rests

11   on the party moving for summary judgment, then in moving for summary judgment the

12   party must establish each element of its case.

13          Once the moving party meets its initial burden on summary judgment, the non-

14   moving party must submit facts showing a genuine issue of material fact.  Fed. R. Civ. Pro.

15   56(e); *Nissan Fire & Marine Ins. Co. v. Fritz Companies, Inc.*, 210 F.3d 1099, 1103 (9th Cir.

16   2000).  As summary judgment allows a court "to isolate and dispose of factually

17   unsupported claims or defenses," *Celotex*, 477 U.S. at 323-24, the court construes the

18   evidence before it "in the light most favorable to the opposing party." *Adickes v. S. H.*

19   *Kress & Co.*, 398 U.S. 144, 157 (1970).  The allegations or denials of a pleading, however,

20   will not defeat a well-founded motion.  Fed. R. Civ. Pro. 56(e); *Matsushita Elec. Indus. Co.*

21   *v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986).  That is, the opposing party cannot

22   "'rest upon the mere allegations or denials of [its] pleading' but must instead produce

23   evidence that 'sets forth specific facts showing that there is a genuine issue for trial.'"

24   *Estate of Tucker v. Interscope Records*, 515 F.3d 1019, 1030 (9th Cir. 2008) (quoting Fed.

25   R. Civ. Pro. 56(e)).

26

3

1    The undisputed facts are established by the evidence submitted to support the

2  unopposed motions for summary judgment, and the allegations of Gonzalez's complaint.

3  On September 17, 2011, Gonzalez and her boyfriend, Alberto Cisneros ("Cisneros"), were

4  visiting Las Vegas from Mexico.   They had been at a friend's house visiting for the Mexican

5  Independence Day.  They had been drinking that night, and got into an argument, and

6  Cisneros left the friend's house and began walking down the street.

7    Despite having consumed ten beers, Gonzalez got into a car and followed Cisneros

8  down the street.  She drove along side Cisneros while he continued to walk down the

9  street, arguing with him through the car window.  Gonzalez and Cisneros ended up in a

10  parking lot located by the El Super Market on E. Charleston Blvd. and Lamb Blvd.

11    A Security Officer, Martin Coleman, was patrolling the shopping center and

12  witnessed an altercation between Gonzalez and Cisneros.  Coleman stated that when he

13  first saw Gonzalez and Cisneros, she attempted to run over Cisneros with her car.

14  Coleman reported that Gonzalez and Cisneros were speaking in Spanish and appeared to

15  be in a heated verbal argument.  Coleman then witnessed Cisneros walk away and

16  Gonzalez become hysterical and follow him.  She then got out of her car and the two

17  began pushing and striking each other.

18    At approximately 4:00 a.m., Coleman called 9-1-1 and reported witnessing a female

19  trying to run over a male.  Coleman then approached Gonzalez and Cisneros, separated

20  them, and waited for LVMPD officers to arrive.

21    At approximately 4:02 a.m., Officers Larsen and Nelson, as well as their supervisor,

22  Sergeant Victor Sabino, arrived at El Super.  The officers saw Gonzalez and Cisneros in

23  front of the car arguing.  Sabino separated them.  Nelson first spoke briefly with Cisneros to

24  identify him.  Larsen, who is fluent in Spanish, spoke in Spanish with Gonzalez, who only

25  speaks in Spanish.  Nelson then spoke with Coleman about what he witnessed.

26

1    Larsen noticed that Gonzalez had visible injuries.  Specifically, Larsen observed

2  scratches on her shoulder and a scrape on her arm.  These marks were noted on the

3  arrest report and photographs were taken at the scene.  Larsen asked her what they were

4  doing that night and what had happened.  Gonzalez told Larsen that she and Cisneros had

5  been at a party and that her boyfriend (Cisneros) wanted to leave, but she did not want to.

6  Cisneros took the keys from Gonzalez and when she tried to get the keys back, he pushed

7  her to the ground and then left on foot.  Gonzalez followed Cisneros in the car.

8    Cisneros told the officers that the argument was because he told Gonzalez that he

9  did not want to marry her.  Cisneros said he was tired of Gonzalez yelling and, when he

10  tried to leave, Gonzalez tried to take the keys away from him and fell to the ground.

11  Cisneros told the officers that Gonzalez pushed him.

12    Nelson spoke with Coleman.  Coleman told Nelson that he witnessed a mutual

13  battery between Gonzalez and Cisneros.  Nelson and Larsen also observed that both

14  Gonzalez and Cisneros appeared to be extremely intoxicated.

15    Based upon the parties' statements (Gonzalez and Cisneros); the independent

16  witness statement, (Coleman); and the visible injuries on Gonzalez when they arrived, the

17  officers arrested both Gonzalez and Cisneros for domestic battery.  Officer Beal was called

18  to transport Gonzalez.  Cisneros was placed in handcuffs and put in the back of Nelson

19  and Larsen's patrol vehicle.  Cisneros complied with the officers' commands and he had

20  no issues with the officers.

21    Gonzalez, on the other hand, refused to follow the officers' commands to stand in

22  front of the patrol car.  Gonzalez yelled and screamed at the officers.  Gonzalez yelled that

23  she wasn't a criminal, and demanded that the officers take the handcuffs off, and put her in

24  the car.  At one point, Gonzalez appeared to faint, slowly going to the ground near the

25  patrol vehicle.  The officers called for medical.  However, when the officers told Gonzalez

26  she was still being arrested, she sat up and said she did not want medical.

1    While the car was being inventoried to be towed, Gonzalez ran to it and tried to get

2    inside.  Sabino grabbed Gonzalez by her shoulder to stop her from getting into the car.

3    When Sabino grabbed her she tried to bite his hand.  Sabino told Gonzalez to stop trying to

4    bite him and lifted up on her handcuffs forcing her to lean forward.  Larsen then assisted

5    Sabino by briefly holding Gonzalez's head so she could not bite them.

6    Beal arrived to transport Gonzalez.  When Beal arrived he saw Cisneros sitting in

7    the back of Larsen and Nelson's patrol vehicle, Larsen and Nelson doing paperwork on the

8    hood of their patrol vehicle, and Gonzalez seated on the ground next to them.  Beal recalls

9    when he took Gonzalez to his patrol vehicle, Gonzalez smelled of alcohol and was

10   extremely irate, crying, yelling and screaming.  Beal transported Gonzalez to the Clark

11   County Detention Center.  During the drive to CCDC, Gonzalez was calling him names like

12   "motherfucker," or "pinche cabron."

13   When Beal was escorting Gonzalez inside CCDC, Gonzalez was twisting and

14   moving from side to side. Gonzalez mis-stepped, fell to her knees, and refused to

15   get back up.  Another officer outside the jail saw Gonzalez being uncooperative. The other

16   officer assisted Beal in getting Gonzalez up and inside the jail.  While being fingerprinted,

17   Gonzalez told Larsen that she was injured as a result of the arrest.  Gonzalez alleged that

18   the injury to her knee was caused by the officers.  When Larsen asked how the officers

19   inflicted the injury, Gonzalez would not specify.  After being booked at CCDC, Gonzalez

20   was placed in isolation for being disruptive.

21   A.    Gonzalez's *Monell* Claim Against the LVMPD Fails.

22   Liability for violations of 42 U.S.C. §1983 was extended to municipalities such as

23   LVMPD as a result of *Monell v. Department of Social Service*, 436 U. S. 658, 98 S. Ct.

24   2018, 56 L. Ed. 2d 611 (1978).  "Congress did not intend municipalities to be held liable

25   unless acts pursuant to an official municipal policy of some nature caused a constitutional

26   tort." *Monell*, 436 U.S. at 691.  *Monell* instructs that in order to impose liability on a

6

1   municipality or a subdivision of a municipality under § 1983, a plaintiff must identify a

2   "municipal 'policy' or 'custom' that caused the plaintiff's injury." *Bd. of Cnty. Com'rs of*

3   *Bryan Cnty., Okl. v. Brown*, 520 U.S. 397, 403 (1997).  "Locating a 'policy' ensures that a

4   municipality is held liable only for those deprivations resulting from the decisions of its duly

5   constituted legislative body or of those officials whose acts may fairly be said to be those of

6   the municipality." *Id.,* at 403-04 (citations omitted).  "Similarly, an act performed pursuant to

7   a 'custom' that has not been formally approved by an appropriate decision maker may fairly

8   subject a municipality to liability on the theory that the relevant practice is so widespread as

9   to have the force of law." *Id.,* at 404 (citations omitted).

10          Simply put, in order to establish Monell liability, Gonzalez has the burden of

11   demonstrating that her injury resulted from the execution of an LVMPD policy or custom.

12   *City of Canton v. Harris*, 489 U. S. 378, 398, 109 S. Ct. 1197,103 L. Ed. 2d 412 (1989).  To

13   satisfy the rigorous *Monell* requirements of causation and culpability, she must "identify the

14   policy, connect the policy to the municipality and show that her injury was incurred because

15   of the execution of the policy."  *Garner v. Memphis Police Dept*., 8 F.3d 358, 364 (6th Cir.

16   1993).

17          1.     The Plaintiff Has Not Alleged a Policy or Custom.

18          Gonzalez's *Monell* claim is that "[u]pon information and belief since 2009 to date,

19   there have been hundreds of previous incidents where LVMPD Officers have used

20   excessive force upon a person." (Complaint, ¶ 39). Plaintiff further alleges that "LVMPD

21   Officers, and each of them, acted under color of law in using physical force against Plaintiff

22   without lawful justification, subjecting the Plaintiff to excessive force, therefore depriving

23   Plaintiff of certain constitutionally protected right . . . ." (Complaint, ¶ 34).  Plaintiff makes

24   no allegation in her Complaint or elsewhere that any formal policy exists which caused her

25   alleged constitutional deprivation.  Gonzalez did not identify a policy, custom or practice in

26   discovery.  Rather, when asked in discovery whether she contended that LVMPD

1   promulgated policy, custom or practice that caused her to be deprived of her civil rights,

2   she responded as follows:

3           Plaintiff's counsel relied on Plaintiff's statement as set forth in
            the Complaint as well as 42 U.S.C. § 1983, which provides in
4           part: Every person who, under color of any statue, ordinance,
            regulation, custom, or usage of any State or Territory subjects,
5           or causes to be subjected, any person of the United States or
            other person within the jurisdiction thereof to the deprivation of
6           any rights, privileges, or immunities secured by the Constitution
            and laws shall be liable to the party injured in an action at law,
7           suit at equity or other proper proceeding for redress.

8   (See, Plaintiff's Responses to Interrogatories, Answer No. 14).  Gonzalez did not provide

9   any supplemental response.  Gonzalez's reliance on her Complaint is hardly sufficient

10  evidence to show that the LVMPD promulgated a policy, custom or practice that caused

11  her to be deprived of her civil rights.

12          Gonzalez has also failed to show that a de facto policy (a "custom") exists at

13  LVMPD to ratify violations of constitutional rights.  In such a case, there must be

14  substantial evidence to indicate the practice is much different from the written policy.  The

15  Ninth Circuit in *Trevino v. Gates*, 99 F. 3d 911 (9th Cir. 1996), cert. denied(520 U.S. 1117)

16  (1997), stated:

17          Absent a formal, governmental policy, [the plaintiff] must show a
            "long standing practice or custom which constitutes the
18          standard operating procedure of the local government entity."
            The custom must be so "persistent and widespread" that it
19          constitutes "permanent and well settled City policy." Liability for
            improper custom may not be predicated on isolated, sporadic
20          incidents, it must be founded upon practices of sufficient
            duration, frequency and consistency that the policy has become
21          a traditional method of carrying out policy.

22  *Id.*, at 918 (internal citations omitted).

23          Here, Gonzalez has not submitted any evidence to suggest that the issues of which

24  she complains are "persistent and widespread" or "permanent and well settled City policy."

25

26

1    Indeed, Gonzalez was asked in discovery whether she contended that prior incidents by

2    LVMPD officers demonstrated the existence of an LVMPD policy, custom or practice that

3    violated her constitutional rights as alleged in her Complaint.  Gonzalez responded:

4    "Plaintiff is in the process of gathering the specific information responsive to this request,

5    and reserves the right to supplement this answer when the information becomes available.

6    Discovery is continuing."  Gonzalez failed to supplement her response, and as such it acts

7    as an admission that she can demonstrate no "persistent" or "widespread" behaviors linked

8    to her allegations.

9           2.      Isolated Acts are Insufficient Under *Monell*.

10          Gonzalez's inability to demonstrate a policy or custom is fatal to her claim.  It is well

11   established that LVMPD cannot be held liable under § 1983 merely because it employed

12   officers who allegedly used excessive force on Gonzalez during a single incident.  *See,*

13   *Monell*, 463 U.S. at 694 n. 58.  A single constitutional deprivation (when undertaken by a

14   state actor without final policy making authority) is insufficient to establish a long standing

15   practice or custom for purposes of *Monell* liability.  *See, Christie v. Iopa*, 176 F. 3d 1231,

16   1235 (9th Cir. 1999) ("a single constitutional deprivation is ordinarily insufficient to establish

17   a long standing practice or custom"); *McDade v. West*, 223 F. 3d 1135, 1141 (9th Cir. 2000)

18   (a plaintiff cannot demonstrate the existence of a municipal policy or custom based solely

19   on a single occurrence of unconstitutional action by a non-policy making employee).

20          Considerably more proof than a single incident is necessary to establish the

21   requisite fault on the part of the municipality. *Davis v. City of Ellensburg*, 869 F. 2d 1230,

22   1233 (9th Cir. 1989).  Such a policy must result from a deliberate choice made by a policy-

23   making official, and may be inferred from a widespread practice or "evidence of repeated

24   constitutional violations for which the errant municipal officers were not discharged or

25   reprimanded." *Gillette v. Delmore*, 979 F. 2d 1342, 1349 (9th Cir. 1992).  As a

26   consequence, to prevent "municipal liability collaps[ing] into respondeat superior liability,"

1  federal courts must apply "rigorous standards of culpability and causation" in order to

2  "ensure that the municipality is not held liable solely for the actions of its employees."

3  *Brown*, 520 U.S. at 404.

4          Gonzalez has done nothing more than allege an isolated incident of wrongdoing by

5  the officers who arrested her. Her allegations are refuted by video surveillance at CCDC,

6  the independent witness to the incident, and her own inconsistent testimony.  Thus, even

7  assuming that her allegations regarding the physical use of excessive force against her

8  were true, Gonzalez has alleged nothing more than one example where her own rights may

9  have been violated in a single occurrence by LVMPD's employees.  Each of her complaints

10  against the individual officers are limited to specific behavior directed at her on one

11  occasion by those officers only.  As such, this incident, even if it occurred exactly as

12  Gonzalez claims, does not support her claim under *Monell* against the LVMPD.  *See,*

13  *Christie*, 176 F. 3d at 1235; *McDade*, 223 F. 3d at 1141.

14  B.      Gonzalez's Excessive Force Claim Against the Individual Defendants.

15          The Fourth Amendment guarantees citizens the right "to be secure in their persons

16  . . . against unreasonable seizures." U.S. Const. Amend. IV.  A Fourth Amendment claim of

17  excessive force is analyzed under the framework set forth by the Supreme Court in

18  *Graham v. Connor*, 490 U.S. 386, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989). That analysis

19  requires balancing the "nature and quality of the intrusion on a person's liberty" with the

20  "countervailing governmental interests at stake" to determine whether the use of force was

21  objectively reasonable under the circumstances.  *Id.,* at 396.  The court cautioned,

22  however, that the "calculus of reasonableness must embody allowance for the fact that

23  police officers are often forced to make split second judgments in circumstances that are

24  tense, uncertain, and rapidly evolving, about the amount of force that is necessary in a

25  particular situation."  *Id.,* at 396-97.  Determining whether a police officer's use of force was

26  reasonable or excessive therefore "requires careful attention to the facts and

circumstances of each particular case" and a "careful balancing" of an individual's liberty with the government's interest in the application of force.  *Id.*, see also, *Deorle v. Rutherford*, 272 F.3d 1272, 1279-81 (9th Cir. 2001).  In evaluating the government's interest, the Court may consider such factors as the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether she is actively resisting arrest or attempting to evade arrest by flight. *Jackson v. City of Bremerton*, 268 F.3d 646, 652 (9th Cir. 2001).

Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates the Fourth Amendment.  *Graham*, 490 U.S. at 396.  The question is not how much force was actually needed, but how much force a reasonable officer would perceive needing.  *Saucier v. Katz*, 533 U.S. 194, 205, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001).  The reasonableness of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight, *Graham*, 490 U.S. at 396, and the officer's conduct need not be the "least intrusive means," but only need to be "within that range of conduct . . . identif[ied] as reasonable." *Billington v. Smith*, 292 F.3d 1177, 1188-89 (9th Cir. 2002).

1.    Gonzalez Did Not Suffer a Constitutional Violation.

In considering Gonzalez's first cause of action for excessive force, the Court must determine whether she has alleged and shown a constitutional violation occurred.  In other words, taken in the light most favorable to Gonzalez, do the facts show that defendant officers' conduct violated a constitutional right of Gonzalez?  *See, Robinson v. Solano County*, 278 F.3d 1007 (9th Cir. 2002).  Gonzalez identified three (3) separate actions that she asserted were constitutional violations.  First, Gonzalez alleged that one of the LVMPD officers (she could not identify which officer) grabbed her, pushed her to the ground, stepped on her ankles, picked her up and threw her against the patrol car, and then forcefully placed handcuffs on her.  Second, Gonzalez alleges while being escorted into the

1  jail, an LVMPD officer pushed her, causing her to fall to the ground and then forcefully

2  grabbed her to pick her up.  Lastly, Gonzalez alleges that while at the jail, in a segregation

3  cell, officers at the jail stepped on her ankles.

4            a.     Stopping Gonzalez From Getting Into Her Car

5         The first allegation of wrongdoing concerns Gonzalez attempting to get in her car

6  during the arrest.  Gonzalez testified that she was barefoot and wanted to go to her car to

7  get her shoes.  Gonzalez stated that she told the officers that she was going to her car to

8  get her shoes, they did not understand her because she was speaking Spanish, and none

9  of the officers spoke Spanish.  Gonzalez alleges that she was thrown to the ground by an

10  officer, picked up with force, thrown against the patrol car and handcuffed.  According to

11  the officers, Gonzalez ran to her car to get into it.  Sabino grabbed Gonzalez by her

12  shoulder to stop her and sat her on the ground. Gonzalez then tried to bite Sabino's hand.

13  Sabino lifted up on Gonzalez' s handcuffs to lean her forward to stop her from biting him.

14  Larsen went to assist and held Gonzalez's head in place to stop her from biting Sabino.

15           i)     Neither Beal Nor Nelson Were Involved In This Incident.

16         Neither Beal nor Nelson were involved in the first encounter alleged by Gonzalez.

17  First, Beal did not even arrive to the scene until well after this had occurred.  Further,

18  Gonzalez cannot identify which officer allegedly engaged in this behavior with her at the

19  car.  Based upon the undisputed testimony of Officer Larsen and Sabino, it was Sabino

20  who stopped her at the car and initially restrained her.  Larsen then assisted Sabino by

21  holding Gonzalez's head to stop her from trying to bite him. Thus, the undisputed testimony

22  shows that Nelson played no role in this encounter.  Based on the undisputed facts, neither

23  Beal nor Nelson engaged in any behavior that amounted to a constitutional violation with

24  respect to this first instance.

25           ii)     Officer Larsen Did Not Stop Gonzalez at the Car.

26

1    Along the same lines, as Gonzalez does not know which officer engaged in the

2    encounter with her at the car, she is unable to create an issue of fact with respect to

3    Larsen's participation.  The undisputed testimony of both Officer Larsen and Sergeant

4    Sabino establish that it was Sergeant Sabino and not Larsen who approached Gonzalez at

5    the car and restrained her from getting into the car.  Thus, even if the trier of fact were to

6    believe Gonzalez was credible when she alleges that an officer threw her to the ground,

7    picked her up with force, and threw her against a patrol car, the undisputed facts are that

8    the only officer that could have been present when this occurred was Sabino.  Sabino is

9    not a party in this litigation.  Accordingly, the only force used by Larsen against Gonzalez

10   was to hold her head in place to stop her from biting Sabino.  Gonzalez has not alleged

11   that her constitutional rights were violated based upon an officer holding her head.  As

12   such, Gonzalez's claims against Officer Larsen similarly fail.

13                          iii)       Even if Larsen Stopped Gonzalez, Her Claim Fails.

14   Regardless of how this instance occurred, the use of force was reasonable.

15   Gonzalez was under arrest, in handcuffs, and was admittedly attempting to get into her car.

16   The officers had not yet inventoried the car.  The car could have items in it which could

17   endanger their safety.  Moreover, Gonzalez's acts were consistent with an attempt to flee.

18   In any event, it was not unreasonable or excessive for Sabino to stop Gonzalez from

19   getting into her car.  In reacting to Gonzalez's actions, Sabino and Larsen used the force

20   necessary to control a rapidly evolving and escalating situation. *See, e.g., City of*

21   *Bremerton*, 268 F.3d 646, 654 (9th Cir. 2001).  Following the *Graham* analysis, Sabino and

22   Larsen's decision to apply minimal force, to wit, to stop Gonzalez from getting into the car

23   by grabbing her shoulder and then sitting her down on the ground, lifting up on her

24   handcuffs and holding her head to stopping her from biting Sabino, was entirely

25   reasonable.

26

      b.      Escorting Gonzalez to Jail Did Not Violate Her Rights.

Gonzalez identifies, as a second instance of the use of excessive force, being escorted into CCDC when an officer allegedly pushed her, and she fell over. Beal was the transporting officer for Gonzalez's arrest and escorted Gonzalez into the jail. Beal recalls that while he and Gonzalez were walking into the jail, Gonzalez was twisting from side to side and flailing around. Beal recalls that Gonzalez was highly intoxicated, took a wrong step and fell over. Gonzalez then refused to get up. Another officer assisted Beal in standing Gonzalez up. In addition, Nelson saw Beal escorting Gonzalez into the jail and his account is that Gonzalez fell to her knees outside the door of the jail.

      c.      The Defendants Did Not Commit the Alleged Excessive Force Against Gonzalez at the Jail.

As for Gonzalez's last allegation that officers used excessive force against her, she alleges that while at CCDC, in the segregation cell, an officer stepped on her ankles. Although it is disputed that any acts of excessive force were used against Gonzalez while she was at CCDC, none of the defendants were present. As Gonzalez has not established that any of these defendants caused this instance of alleged excessive force, summary judgment is appropriate.

    2.     The Officers are Entitled to Qualified Immunity.

Even assuming, from these undisputed facts, that a constitutional violation occurred, the defendants are entitled qualified immunity. Where a defendant asserts he is entitled to qualified immunity, the court must rule on that issue as early in the proceedings as possible in order to avoid the expense of an unnecessary trial. *Saucier v. Katz*, 533 U.S. 194, 200-01, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001). Qualified immunity is "an immunity from suit rather than a mere defense to liability; and like an absolute immunity, it is effectively lost if a case is erroneously permitted to go to trial." *Id.* (citation omitted) (emphasis in original).

1    Qualified immunity claims are evaluated under a two-step process.  First, the court

2    must ask: "Taken in the light most favorable to the party asserting the injury, do the facts

3    alleged show the officer's conduct violated a constitutional right?" *Id.,* at 201.  If no such

4    constitutional violation would be present were the allegations established, then the analysis

5    of qualified immunity ends.  *Id.*  But, if the answer to the first question is in the affirmative,

6    then the court must ask whether the constitutional right violated was clearly established.

7    *Id.*

8    More specifically, under the second part of this inquiry: "the right the official is

9    alleged to have violated must have been 'clearly established' in a more particularized, and

10   hence more relevant, sense: The contours of the right must be sufficiently clear that a

11   reasonable official would understand that what he is doing violates that right." *Id.* (*citing*

12   *Anderson v. Creighton*, 483 U.S. 635, 640, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987)).  In

13   other words, "the relevant, dispositive inquiry in determining whether a right is clearly

14   established is whether it would be clear to a reasonable officer that his conduct was

15   unlawful in the situation he confronted." *Id.*  Qualified immunity protects "all but the plainly

16   incompetent or those who knowingly violate the law."  *Malley v. Briggs*, 475 U.S. 335, 341,

17   106 S.Ct. 1092, 89 L.Ed.2d 271 (1986).  Therefore, summary judgment is appropriate if the

18   law does not put a police officer on notice that his conduct is unlawful. *Saucier*, 533 U.S. at

19   202.

20   The defendant officers' use of force did not rise to the level of a constitutional

21   violation.  Under *Graham*, a claim for excessive force is determined under an "objective

22   reasonableness standard."  *Graham*, 490 U.S. at 388.  This is the first step in the analysis

23   that determines the existence of a constitutional violation.

24   Nonetheless, even if the Court assumed that the force used by the officers was

25   excessive under *Graham*, the officers did not violate constitutional limits "clearly

26   established" by existing law under the second step of the qualified immunity inquiry.  This

second step of examination is very distinct from the analysis under *Graham*.  It is this step

that recognizes that police officers make reasonable mistakes in determining the

appropriate level of force to utilize.  As stated by the Supreme Court: "It is sometimes

difficult for an officer to determine how the relevant legal doctrine, here excessive force, will

apply to the factual situation the officer confronts.  An officer might correctly perceive all of

the relevant facts but have a mistaken understanding as to whether a particular amount of

force is legal in those circumstances.  If the officer's mistake as to what the law requires is

reasonable, however, the officer is entitled to the immunity defense." *Saucier*, 533 U.S. at

205.  In this light, the *Graham* standard does not always provide officers with clear answers

to whether the use of force may be excessive.  *Id.*  As the border between acceptable and

excessive force is blurred, qualified immunity ensures that law enforcement officers are

liable only when they are unmistakably on notice that their conduct is plainly unlawful.

Here, the evidence presented to the Court is that Gonzalez was being resistive and

non-compliant with the officers during the arrest.  According to each officer, Gonzalez was

hysterical. Gonzalez admittedly attempted to get into her car during the arrest.  Taking

Gonzalez's allegations as true without any consideration for defendants' version of events,

they were merely engaging in appropriate action to stop Gonzalez from doing so.  In order

to meet her burden, Gonzalez needs to demonstrate that the force used was so plainly

excessive that the police officer should have been on notice that he was violating the

Fourth Amendment.

Gonzalez has not identified any body of case law that puts officers on notice that, in

similar circumstances, their conduct would be so egregious as to rise to the level of a

Fourth Amendment violation. In fact, the established case law appears to hold to the

contrary.  Perhaps the closest analogous case is the case of *Hinton v. City of Ellwood,*

*Kansas*, 997 F.2d 774 (10th Cir. 1993).  In that case, the police initially stopped plaintiff

Hinton for the misdemeanor of disturbing the peace.  Hinton refused to talk with the police

16

1   when they requested him to stop, and Hinton actively and openly resisted attempts to be

2   handcuffed, even to the extent of biting the officers.  In that case, the Tenth Circuit held

3   that wrestling a defendant to the ground and using a stun gun are not inappropriate police

4   practices when a suspect is resisting arrest.  *Id.,* at 781.  In Hinton, the court was quick to

5   note that these types of maneuvers by the police would only be inappropriate if the

6   arrestee had made no additional "aggressive moves or threats" towards the officers.  *Id.*, at

7   782.

8          Therefore, even assuming that the defendants' alleged use of force somehow

9   violated the Constitution, their conduct was not so far afoul of established constitutional

10  principles as to defeat their qualified immunity from suit for excessive force.  Accordingly,

11  the Court finds that the defendants are entitled to qualified immunity on Gonzalez's claim

12  for excessive force and an entry of summary judgment against Gonzalez is appropriate.

13  C.    Gonzalez's State Law Causes of Action Against Defendants are Barred

14         Gonzalez's causes of action based on Nevada state law are barred by Nevada

15  statute.  Pursuant to NRS 41.032:

16              [N]o action may be brought . . . against an immune contractor or
               an officer or employee of the State or any of its agencies or
17              political subdivisions which is: . . . Based upon the exercise or
               performance or the failure to exercise or perform a discretionary
18              function or duty on the part of the state or any of its agencies or
               political subdivisions or of any officer, employee or immune
19              contractor of any of these, whether or not the discretion involved
               is abused.

20

21  Under this statute, officers are immune from suits resulting from their discretionary acts

22  "whether or not the discretion involved is abused."  The statute contains no words which

23  qualify or modify this immunity.  Furthermore, Nevada case law states that this immunity is

24  absolute.  In *Martinez vs. Maruszczak*, 168 P.3d 720 (2007), the Supreme Court of

25  Nevada adopted the Berkovitz-Gaubert approach and clarified that to fall within the scope

26  of discretionary immunity, a decision must 1) involve an element of individual judgment or

17

1   choice and 2) be based on considerations of social, economic, or political policy. The court

2   went on to clarify that "decisions at all levels of government, including frequent or routine

3   decisions may be protected by discretionary-act immunity, if the decisions require analysis

4   of government policy concerns."  Here, the acts complained were discretionary.  *See,*

5   *Maturi v. Las Vegas Metro. Police Dept*., 110 Nev. 307, 309, 871 P.2d 932, 934 (1994).  A

6   discretionary act is any act that requires personal deliberation and judgment. *See Maturi,*

7   *110 Nev. at 309, 871 P.2d at 934*.

8        1.      Gonzalez's Negligent Hiring, Training & Supervision Claim.

9        The Ninth Circuit has indicated that Nevada looks to federal decisional law for

10   guidance on what type of conduct discretionary immunity protects. The Ninth Circuit has

11   held that "decisions related to the hiring, training, and supervision of employees usually

12   involve policy judgments of the type Congress intended the discretionary function exception

13   to shield."  *Vickers v. United States*, 228 F.3d 944, 950 (9th Cir. 2000).  Accordingly, the

14   Court finds that Gonzalez's claim against the LVMPD for negligent hiring, training, and

15   supervision is barred by §41.032.

16        2.      The Remaining Claims.

17        With respect to the other claims, courts interpreting NRS 41.032 have specifically

18   held that it bars claims against law enforcement officers for battery, false imprisonment,

19   intentional infliction of emotional distress, negligence, and negligent infliction of emotional

20   distress based upon the performance of discretionary acts, like effectuating an arrest.  *See,*

21   *Carey v. Nevada Gaming Control Board*, 279 F.3d 873, 878 (9th Cir. 2002), *Ortega v.*

22   *Reyna*, 114 Nev. 55, 62, 953 P.2d 18, 23 (1998) (holding that NRS 41.032 bars suit against

23   Nevada Highway Patrol trooper for false arrest, false imprisonment, intentional infliction of

24   emotional distress, malicious prosecution, and negligent infliction of emotional distress),

25   *Bruttomesso v. Las Vegas Metro. Police Dept*., 95 Nev. 151,153, 591 P.2d 254, 255,

26   (1979) (barring negligence claim based upon failure to provide security).  *See also, Maturi*,

1   110 Nev. at 309, 871 P.2d at 934 (finding that police officer's decision to handcuff prisoner

2   behind prisoner's back constituted discretionary decision and, thus, officer was statutorily

3   immune from suit).

4        As the acts were clearly discretionary, the question is whether or not they are

5   grounded in public policy. *Tippett v. United States*, 108 F.3d 1194 (10th Cir. 1997) provides

6   important guidance. There, a park ranger's actions were analyzed to see whether or not

7   discretionary immunity would apply. Finding the ranger had a choice in how his actions

8   were to be taken, the court noted that the types of actions undertaken by the ranger "were

9   driven by the same policy concerns which led to the promulgation of the regulations in the

10  first place." 108 F.3d at 1199.  Because the ranger's actions were consistent with the type

11  of protection for the public that the National Park Service had as an agency, they fell within

12  the concepts of "policy analysis" identified by the United States Supreme Court and were

13  subject to discretionary immunity.

14       In this case, the officers' actions in utilizing any force during the arrest (consistent

15  with the LVMPD's Use of Force Policy) are capable of policy analysis.  LVMPD's Use of

16  Force Policy exists for the protection of the public, the officer, and the suspect at issue.  It

17  is designed to have officers utilize the force necessary to achieve the goal of protection

18  while avoiding danger to the officer and the general public.  The officers' actions are

19  predicated upon the actions of the suspect.  Yet the policies give officers discretion as to

20  which tools to implement and what level of force they perceive to be necessary under the

21  circumstances.

22       As set forth above, the defendant officers were confronted with a situation where

23  Gonzalez was noncompliant, resistant and attempted to enter a car.  In an instant, they had

24  to analyze LVMPD policy and had to determine the appropriate response to the evolving

25  situation.  The correct response is based on issues of constitutional protection and the

26  need to maintain order.  These types of issues clearly involve social policy. *Priah v. United*

19

1   *States*, 590 F. Supp. 2d 920, 929 (N.D. Ohio 2008).  Accordingly, §41.032 bars Gonzalez's
2   state-law claims against the officers.

3   **D.   Gonzalez' Negligent Supervision and Training Claim also Fails on the Merits**

4          Gonzalez alleges that LVMPD violated her civil rights by failing to adequately train
5   and supervise its officers by having inadequate training and supervisory procedures
6   regarding seizures, securing medical treatment for injured suspects, and the use of force to
7   apprehend a person. (Complaint at ¶59).  Even if this claim were not barred, it fails.

8          **1.   Gonzalez Has Not Produced Any Evidence Regarding a Failure to Train.**

9          Decisions concerning a properly brought *Monell* claim alleging inadequate training
10  are instructive as to what constitutes the standard of care for police training.  In *City of
11  Canton v. Harris*, 489 U.S. 378 (1989), the Supreme Court established a three-part test
12  with respect to when the inadequacy of police training may serve as the basis for municipal
13  liability under §1983.  *See also Merritt v. County of Los Angeles*, 875 F.2d 765,770 (9th Cir.
14  1989).  First, it must be determined whether the existing training program is adequate.  A
15  training program will be deemed adequate if it "enable[s] officers to respond properly to the
16  usual and recurring situations with which they must deal."  *See, Merritt*, 875 F.2d at 770,
17  citing *Canton*, 489 U.S. at 391.  Second, if the training program is deemed inadequate, it
18  may be justifiably said to constitute a city policy.  Such will be the case, however, "only
19  where the failure to train amounts to deliberate indifference to the rights of persons with
20  whom the police come into contact."  *Canton*, 489 U.S. at 391.  This heightened degree of
21  culpability on the part of a municipality may be established when the "need for more or
22  different training is so obvious, and the inadequacies so likely to result in the violation of
23  constitutional rights, that the policy makers of the city can reasonably be said to have been
24  deliberately indifferent to the need."  *Id.*  Third, and finally, inadequate training that
25  manifests a deliberate indifference on the part of a municipality must be shown to have
26  "actually caused" the constitutional deprivation at issue.  *Id.*

1    Gonzalez has not proffered any evidence showing how LVMPD's training is

2  inadequate.  She has not identified any expert who has criticized the training programs of

3  LVMPD or specifically the training of the subject officers.  The LVMPD, on the other hand,

4  has submitted evidence and information establishing that its officers are properly trained.

5  According to LVMPD's official policy regarding training:

6           The Department has the responsibility to provide the best
            personnel for service to the communities its serves. In fulfilling
7           that responsibility, it is the policy of the department to provide
            basic training to the new employee, and advance, or in service
8           training for the experienced employee.

9  During discovery, Gonzalez deposed Officers Nelson, Larsen and Beal regarding their

10  training. They discussed in great deal the training received by them regarding arrest and

11  use of force. It is un-rebutted that all LVMPD recruits undergo 11 weeks of intensive

12  academy training before becoming an LVMPD officer.  If a recruit fails or does not

13  complete the training, he or she is not added to the force.  Further, after an officer has

14  graduated from the academy, he or she is required to continue training and education in

15  these areas on a regular basis.  At least one circuit, the Fifth Circuit, has held that if a law

16  enforcement agency meets state standards for training, the plaintiff cannot sustain a failure

17  to train cause of action.  *See, Conner v. Travis County*, 209 F. 3d. 794, 798 (5th Cir. 2000).

18  As set forth supra, LVMPD exceeds the NAC criteria.

19    Gonzalez has not submitted any evidence regarding her failure to train allegations.

20  She has not submitted any evidence that the training programs are inadequate, that

21  LVMPD is deliberately indifferent towards training, or that LVMPD's failure to train led to

22  Gonzalez's alleged constitutional deprivations.

23    2.    Gonzalez Failed To Submit Evidence That LVMPD Fails To Supervise.

24    Gonzalez next alleges LVMPD fails to supervise its officers.  Again, *Monell* cases

25  discussing this tort are instructive to the Court.  With respect to such claims, the courts

26  have required plaintiffs to prove a heightened degree of culpability to establish a cause of

21

1   action under §1983.  *Gentile v. County of Suffolk*, 926 F.2d 142 (2nd Cir. 1991).  In order to

2   prove this allegation, a plaintiff must prove a series of prior unconstitutional violations by

3   officers and then prove that no discipline was imposed on the officers.  *See Roman v. City*

4   *of Richmond*, 570 F. Supp. 1554 (N.D. Cal. 1983); *McKenna v. City of Memphis*, 785 F.2d

5   560 (6th Cir. 1986).  It is the plaintiff's burden to prove that the municipality's response to

6   the series of prior complaints was inadequate.

7           Again, Gonzalez has not submitted any evidence supporting her claim of failure to

8   supervise.  To the contrary, the evidence submitted by defendants establishes that Officers

9   Nelson, Larsen and Beal's supervisor, Sergeant Sabino was present during the entire

10  incident. Additionally, as soon as Gonzalez made her claim of injury to Officer Larsen at the

11  jail, Officer Larsen filed the appropriate use of force report. This report was forwarded to

12  Officer Larsen's supervisor, who reviewed the report and determined that Officer Larsen

13  acted appropriately. Such documentation clearly establishes that LVMPD is both actively

14  supervising and taking appropriate steps to counsel its officers during such critical areas of

15  operation such as uses of force.

16  E.    Gonzalez's Causes of Action for Assault and Battery Fail.

17          Notwithstanding the fact that Gonzalez's Third and Fourth Causes of Action for

18  assault and battery are barred by NRS 41.032, they also fail as a matter of law. In Nevada,

19  "[t]o establish an assault claim, a plaintiff must show that the actor (1) intended to cause

20  harmful or offensive physical contact, and (2) the victim was put in apprehension of such

21  contact." *Switzer v. Rivera*, 174 F.Supp.2d 1097, 1109 (D. Nev. 2001).  Similarly, "[t]o

22  establish a battery claim, a plaintiff must show that the actor (1) intended to cause harmful

23  or offensive contact, and (2) such contact did occur." *Id.*  Nevada case law also recognizes

24  the affirmative defenses of both self-defense and consent to the intentional torts of assault

25  and battery.  *See, Giordano v. Spencer*, 111 Nev. 39, 42, 888 P.2d 915, 918 (1995)

26  (holding that a person acting in self-defense cannot be held liable for either assault or

battery); *Prell Hotel Corp. v. Antonacci*, 86 Nev. 390, 393, 469 P.2d 399, 401 (1970) (holding that if a plaintiff consents through words and actions to an assault and battery, the defendant cannot be held liable).  Here, the defendants are not liable for the claims of assault and battery brought by Gonzalez because (1) Nelson didn't engage in any acts, (2) Larsen acted in defense of Sabino, and (3) Gonzalez's words and actions constitute consent and therefore negate the existence of an assault or battery.

       1.     Self-Defense.

      The common law protects an officer who is attempting to carry out his duty when arresting a suspected criminal or a person disturbing the peace if the officer acts in a reasonable manner and does not use more force than necessary. See *Schell v. Collis*, 83 N.W.2d 422, 424 (N.D. 1957).  "In making an arrest [the police officer] is under no obligation to retreat but has both the legal right and the affirmative duty to press forward and accomplish his object by overcoming any resistance offered." *Id.*  When determining the reasonableness of a police officer's actions, the court must give consideration "to the fact that police officers are often required to make split-second decisions in stressful, dangerous, and rapidly changing circumstances." *Graundrealt v. Salem*, 923 F.2d 203, 205 (1st Cir. 1990).  In Nevada, every citizen has a duty to peacefully submit to an arresting officer, or face punishment by fine and imprisonment.  *See*, NRS 199.280.

      In *Schell*, a man, who had been drinking heavily, was combative when police first attempted to arrest him for public intoxication.  *Schell*, 83 N.W.2d at 425.  When told he was under arrest, the plaintiff told the arresting officers: "No (using a very derogatory expression) is going to take me home." *Id.*  The plaintiff then kicked an officer in the crotch in order to escape. *Id.*  When the officer doubled over in pain, the plaintiff kicked him in the shoulder. *Id.*  In response, the police officer hit the man in the face, and the blow caused the loss of the man's eye, due to the impact of the plaintiff's previously broken eyeglass lens striking his eye. *Id.*  The court held in favor of the defending police officer,

1   notwithstanding the unfortunate results, because the circumstances of the assault, rather

2   than the result, control the outcome of the case, and in that case the officer acted

3   reasonably in defending himself.  *Id.*  In contrast, a police officer was liable for assault and

4   battery when he hit a man with whom he was having heated words three times in the face.

5   *Orr v. Walker*, 310 S.W.2d 808 (Ark. 1958).  In that case, the court found the officer's

6   actions unreasonable and excessive because they were unnecessary to accomplish the

7   arrest and because the officer's actions were not necessary to protect himself or others

8   from physical harm.  *See, id.*

9        In this case, Sabino and Larsen clearly acted in self-defense and in furtherance of

10   their duty to keep the peace.  Even before Defendants and Sabino arrived in order to

11   investigate the reported domestic battery, they were aware that Gonzalez had attempted to

12   run over Cisneros with her vehicle and Gonzalez and Cisneros had hit each other.  When

13   the defendants arrived, they instantly knew that Gonzalez and Cisneros were intoxicated.

14   After arresting both Gonzalez and Cisneros for domestic battery, Gonzalez ran and

15   attempted to get into the car.  When Sabino attempted to stop Gonzalez, Gonzalez

16   attempted to bite him.  Sabino sat Gonzalez down on the ground, lifted up on her

17   handcuffs, and Larsen held Gonzalez's head so that she could not bite Sabino.

18        Due to Gonzalez's combative state and her attempt to bite Sabino, sitting Gonzalez

19   on the ground and restraining her from biting Sabino was necessary.  All of these actions

20   were made in self-defense and in order to stop Gonzalez.  At no time was Larsen vindictive

21   or ruthless in his actions toward Gonzalez.  Unfortunately, because of Gonzalez's own acts,

22   she suffered bruising to her knees and arms. Yet, as noted in *Schell*, the circumstances of

23   the assault, rather than the result, control the outcome of this case.

24        If an ordinary citizen were faced with a person attempting to bite them, reason

25   dictates that the citizen would be allowed to defend themselves from being bitten by the

26   person.  Under the common law, Sabino and Larsen are entitled to even greater deference

24

1   for their judgments because they were acting as police officers in an effort to carry out their

2   official duties. Under these circumstances, the Court finds that Larsen acted in self-defense

3   and in furtherance of his duties as a police officer.

4       2.   Gonzalez's Actions Negate the Existence of Assault or Battery.

5       When a plaintiff sues for damages resulting from an alleged assault and battery, the

6   plaintiff may not recover the damages sought "[if oral abuse or provocation is]

7   accompanied by an overt hostile act [because] such oral abuse may amount to a challenge

8   to fight and constitute consent." *Prell Hotel Corp. v. Antonacci*, 86 Nev. 390, 393,469 P.2d

9   399, 401 (1970). In such situations, "[c]onsent negates the existence of the tort, and

10   therefore, denies liability." *Id.*

11       In this case, Gonzalez's actions clearly constitute consent. In fact, her actions

12   epitomize the legal concept of consent to assault and battery. Throughout the incident

13   Gonzalez was resistive, non-compliant and, in one instance, combative.  In such a

14   situation, any reasonable person would realize that such actions would cause an

15   altercation, and under the law, when a person such as Gonzalez causes an altercation

16   through her attempts to bite another human being, she effectively consents to any assault

17   and battery on her person. In this case, Gonzalez's actions signify consent and this Court

18   finds that Gonzalez's consent justifies Larsen's alleged assault and battery.  Thus,

19   summary judgment in favor of Defendants is proper.

20   F.   Plaintiff Has Produced No Evidence to Establish Her Seventh Cause of Action for

21       Intentional Infliction of Emotional Distress

22       Even if § NRS 41.032 did not bar Gonzalez's claim for intentional infliction of

23   emotional distress, she has failed to submit any facts to support her claim. Intentional

24   infliction of emotional distress is a common law claim, the elements of which followed the

25   Restatement (2d) of Torts and are set out in *Star v. Rabello*, 97 Nev. 124, 625 P.2d 90

26   (1981).  A claim for intentional infliction of emotional distress requires:

> (1) extreme and outrageous conduct with either the intention of, or reckless disregard for, causing emotional distress; (2) the plaintiff suffers severe or extreme emotional distress; (3) actual or proximate cause.

*Rabello*, 97 Nev. at 125,627 P.2d at 93.

"It is not enough that a defendant has acted with an intent which is tortious or even criminal, or that he is intending to inflict emotional distress."  Restatement (2d) of Torts §46, cmt. d (1965).  "Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized community." *Id.*  Liability does not extend to mere insults, indignities, threats or annoyances.  *Id.*  Where a plaintiff fails to produce any evidence to establish either the first or second element of a claim for intentional infliction of emotional distress, entry of summary judgment in favor of the defendant is appropriate.  *See Barmettler v. Reno Air, Inc*, 114 Nev. 441,447, 956 P.2d 1382, 1386 (1998); *See also, Moreland v. Las Vegas Metro. Police Dept*., 159 F.3d 365, 374 (1998) (holding that grant of summary judgment in favor of Defendant police officer was appropriate where Plaintiff did not identify sufficient evidence to create a trial issue as to whether the officer engaged in extreme or outrageous conduct, with at least reckless disregard to cause emotional distress).

Gonzalez has produced no evidence that the officers' actions toward her were made with either the intention of, or reckless disregard for, causing her emotional distress. To the contrary, common sense and the known facts demonstrate that Gonzalez was uncooperative, irate and intoxicated.  Gonzalez's conduct is readily apparent in the depositions of the individual officers, her statements to police at the time of her arrest, and the statement of the independent witness.  Further, Gonzalez also admitted, in part, to her conduct in her own deposition.

26

x

Moreover, Gonzalez's claimed injuries do not involve emotional distress. She gave no responses to written discovery or in deposition that would suggest that she has suffered severe or extreme emotional distress. As there is no evidence to establish either the first or second element of this claim, entry of summary judgment is appropriate in favor of all defendants.

Therefore, for good cause shown,

THE COURT **ORDERS** that the Motion for Summary Judgment (#25) by defendants Jonathan Larsen, John Nelson, and Zackery Beal, is GRANTED;

THE COURT **FURTHER ORDERS** that the Motion for Summary Judgment (#26) by defendant (#25) Las Vegas Metropolitan Police Department is GRANTED.

DATED this ___ day of March, 2014.

Lloyd D. George
United States District Judge

27